134 F.Supp.2d 1074 (2001)
Judy OBERTS on Behalf of Theresa L. OBERTS, Plaintiff,
v.
William A. HALTER,[1] Defendant.
No. 1:99CV00131(MLM).
United States District Court, E.D. Missouri, Southeastern Division.
March 26, 2001.
*1075 *1076 J. Michael Payne, Brian D. Mauk, Limbaugh and Russell, Cape Girardeau, MO, for Theresa L. Oberts, a minor, next friend, Judy Oberts, plaintiff.
Maria C. Sanchez, Office of U.S. Attorney, St. Louis, MO, for Social Security Administration, commissioner, Kenneth S. Apfel, defendant.

MEMORANDUM AND ORDER
MEDLER, United States Magistrate Judge.
This is an action under Title 42 U.S.C. § 405(g) for judicial review of defendant William A. Halter's ("Defendant") final decision denying plaintiff Theresa L. Obert's ("Plaintiff") application for Social Security benefits under Title XVI of the Social Security Act. Both parties have filed briefs in support of their respective positions. [13, 17] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). [8]

I.

PROCEDURAL HISTORY
On April 26, 1997, Plaintiff filed an application for supplemental security income benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. (Tr. 104-106), alleging a disability beginning April 1, 1995, by reason of a low I.Q. The application was denied initially (Tr. 85, 94-97) and upon reconsideration. (Tr. 82, 89-92).
Plaintiff requested a hearing (Tr. 88) which was held on July 31, 1998, before Administrative Law Judge ("ALJ") Julian Cosentino. (Tr. 19-81). The ALJ determined that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 8-18).
After considering additional briefing and medical evidence (Tr. 2, 5 223-254), the Appeals Council denied review of the ALJ's determination. (Tr. 3-4). Thus, the decision of the ALJ stands as the final determination of the Commissioner.

II.

TESTIMONY BEFORE THE ALJ
Theresa Oberts, the claimant, testified before the ALJ on July 31, 1998. She *1077 testified that she was nine years old, but did not know what grade she was in. (Tr. 23). She has "a lot" of friends at school. (Tr. 25). She indicated that she has one sister and one brother. (Tr. 24). During the summer, she likes to swim, although she does not know how to swim. She also likes to play Nintendo games and watch cartoons on television. (Tr. 24-25).
Sharon Sue Bennett also testified before the ALJ at the hearing. She is a psychological examiner for the Cape Girardeau Public School District, a position she had held for two years. Prior to that, she worked for the school system for twenty-five years in various positions of counselor and psychological examiner. (Tr. 27).
Ms. Bennett testified that, as a psychological examiner, her job duties include testing and examining students. (Tr. 27). One of those students was Plaintiff. She tested and examined Plaintiff in February 1998. She tested Plaintiff because the School District is required by law to reevaluate every student that is served in special education every three years. As of January 1998, Plaintiff had been in special education for a three-year period of time. (Tr. 28).
In January 1998, Ms. Bennett administered to Plaintiff an individualized achievement test, the Wechsler Individual Achievement Test ("WIAT"). (Tr. 28). The WIAT covers reading, spelling and math at the level in which Plaintiff was functioning. The results showed standard scores within the sixties, significantly below the scores expected for a child of normal intelligence at her age and grade, which is 100. (Tr. 32-33). Plaintiff's composite score in reading was 63. Her composite score in math was 62. Both of these scores were consistent with an earlier I.Q. test.
The WIAT scores indicated that Plaintiff had significant limitations in her cognitive abilities. (Tr. 34). While her age was appropriate for third grade, her reading skills came out to be equivalent to the first month of first grade and her math skills tested to be equivalent to the sixth month of first grade. (Tr. 34). Ms. Bennett believed, based on testing, that Plaintiff had a severe and marked limitation in her cognitive functioning. (Tr. 34-35). This limitation in the cognitive functioning significantly limited her ability to function appropriately and effectively when compared to other children her age. (Tr. 35). Ms. Bennett stated that Plaintiff's scores placed her in the first percentile. In other words, 99 percent of the children her age would have scored better than Plaintiff on this test. (Tr. 47).
Ms. Bennett stated that she did not administer an I.Q. test to Plaintiff because she had two prior individual assessments and Ms. Bennett believed that the prior testing was still valid. One I.Q. test was given in December 1994 and another in January 1995. (Tr. 29). In the December 1994 test, Plaintiff scored a verbal I.Q. of 51, a performance I.Q. of 57 and a full scale I.Q. of 50. (Tr. 30). The January 1995 test revealed a composite score of 65, plus or minus five points. (Tr. 30). The 65 I.Q. score was Plaintiff's highest score on any I.Q. test. (Tr. 31). Ms. Bennett testified that the average I.Q. score is 100. Plaintiff's lower scores indicated significant limitations in her cognitive functioning when compared to age and grade peers. (Tr. 31).
Cheryl Lynn Bertrand testified next before the ALJ. She is a special education teacher and works in a self contained special services classroom. She has held that position for eighteen years, rotating through different grade levels. She stated she was Plaintiff's special services teacher for the third grade, Plaintiff's most recent school level. (Tr. 48). Plaintiff spent approximately 70% of her week in Ms. Bertrand's *1078 room. The remaining 30% of the time, Plaintiff went to classes with her peers. Ms. Bertrand reported that, while Plaintiff was a third grader, she was working overall on a beginning first grade level in reading, math and written expression. (Tr. 49-50). Ms. Bertrand gave Plaintiff a Bergen's individual achievement test of basic skills in January 1998. This test covered Plaintiff's reading, listening, spelling, writing, and math skills. Results showed that Plaintiff was working overall on primer to first grade levels (levels were kindergarten, preprimer, primer, first grade, second grade). (Tr. 50). She was at the first grade level in math. (Tr. 50-51). Her reading was at the primer level. (Tr. 51). Her spelling was at the first grade level. (Tr. 52). On her "visual motor" test she scored between the third and fourth grade levels. On the "visual memory," where she was shown a shape that is then covered up and Plaintiff is expected to replicate, she scored at the kindergarten level. (Tr. 53).
Based on Ms. Bertrand's classroom observations and testing, Ms. Bertrand testified that Plaintiff had a severe and marked limitation in her cognitive functioning. This limitation in her functioning limited her ability to function appropriately and effectively as opposed to other children her age. (Tr. 53).
Ms. Bertrand also testified that she administered to Plaintiff the Vineland Adaptive Behavior Scale in January or February 1998. This is an adaptive behavior skills test. This test assesses how well Plaintiff can adapt to the environment. (Tr. 54). Plaintiff's scores on this test were higher than her I.Q. (Tr. 55). She scored moderately low in communication (76), daily living skills (76) and socialization (78). (Tr. 56). Her composite score was 74. This, too, is moderately low. Based on the Vineland test and on Ms. Bertrand's classroom observations, Ms. Bertrand was of the opinion that Plaintiff had a marked limitation in her adaptive or social functioning. This would significantly limit her ability to function independently and effectively as other eight-year-old children do. (Tr. 57).
Ms. Bertrand further testified that Plaintiff had deficiencies in concentration, persistence and in keeping pace. She needed a lot of one-on-one help and had to be often reminded to get back on task in order to finish assignments. To learn a new task, she had to be told several times and shown several different ways. (Tr. 57).
Ms. Bertrand reported that the reason Plaintiff is in special education is because she is unable to complete the work at her peers' grade level. This is not strictly an I.Q. issue as much as it is an academic level. She is working on a first grade level. She would be unable to complete the third grade level materials. (Tr. 59). She is classified as mildly mentally retarded. As far as behavior, she does not have any behavioral problems. (Tr. 60). She tries to do her best and she minds with adults. (Tr. 63). She is a very hard worker. She is pleased in her achievements. She likes to have teachers to be proud of her work. (Tr. 65). Her verbal skills seem to be a little bit higher than her performance. (Tr. 65).
The next witness to testify before the ALJ was Helen Ruth Arrington. She is a classroom teacher in the Cape Girardeau and has been for about sixteen years. She was Plaintiff's "regular" third grade classroom teacher. Ms. Arrington testified that Plaintiff came into the regular classroom for the morning attendance, gym, art, music, science and some "seat" work. (Tr. 67). Plaintiff required assistance with the science because it would require reading and recording. Other students would assist her with this. (Tr. 67). Ms. Arrington *1079 observed that Plaintiff could not keep pace with the other students. (Tr. 68). She did not understand most of the instruction. (Tr. 68). Ms. Arrington believed that, at the third grade level, Plaintiff has some significant limitations on her ability to follow directions, complete tasks on time and keep pace. (Tr. 70). Compared to third graders, this limitation would seriously interfere with her ability to function independently and appropriately as other third graders would. (Tr. 71). She did not think that Plaintiff would function well in a class room with thirty students on a constant basis. (Tr. 71).
Ms. Bertrand also believed Plaintiff had significant limitations in her cognitive abilities. (Tr. 73). These limitations would also limit Plaintiff in being able to function independently and appropriately as other third graders would. (Tr. 73). Ms. Arrington is unaware of any behavioral disorder that Plaintiff might have. (Tr. 74). These limitations would be caused only by her mental retardation. (Tr. 74).
Finally, Plaintiff's mother testified before the ALJ (Tr. 75). She said Plaintiff has some difficulty dressing herself, in that sometimes she would put her clothes on backwards. Also, she does not tie her shoes well. She needs to be reminded to do things and her mother needed to repeat things for her. She cannot tell time well. She cannot count money well. Plaintiff's mother stated that Plaintiff has a history of seizures. (Tr. 77). She was recently seen by a doctor for the seizures. (Tr. 78). Testing, however, was not complete. (Tr. 79).

III.

MEDICAL AND OTHER RECORDS BEFORE THE ALJ
Plaintiff's mother completed a "Function Report  Child" on April 22, 1997. In that report, Plaintiff's mother indicated that Plaintiff had no trouble seeing, hearing or talking. (Tr. 155-156). She also did not have any limitations in her physical abilities, in her behavior, in her ability to help herself, or in her ability to cooperate with others in taking care of personal needs. (Tr. 159-62). She did have some trouble communicating, in that she could not deliver telephone message, repeat stories she had heard, explain why she did something, or use sentences with "because" "what if," or "should have been." However, she was able to tell jokes or riddles accurately, and talk with family and friends. (Tr. 157). The report reflected that Plaintiff's ability to progress in learning was limited. She could not read and understand simple sentences, read and understand stories in books or magazines, write in longhand (Script), spell most 3-4 letter words, write a simple story with 6-7 sentences, add and subtract numbers over 10, know the days of the week or months of the year, understand money, or tell time. She could, however, read capital letters and small letters of the alphabet, read simple words, print some letters and print her name. (Tr. 158). She also had limitations in her ability to pay attention and stick with a task. While she was able to keep busy on her own and complete her homework (of which she had little), she was unable to finish the things she started, work on arts and crafts projects, or complete chores most of the time. (Tr. 162).
A teacher questionnaire completed May 5, 1997 by Nora Stranahan, Plaintiff's second grade teacher, reflected the following. While in the second grade, Plaintiff's WPPSI-R revealed a full scale I.Q. of 50 ± 6. Concentration/attention span were commensurate with this level. Plaintiff tried hard and was reading at the primer-first grade level, and was at the first grade level for both math and spelling. She was able to complete all tasks with the help of a teacher and needed one-on-one instruction. She followed verbal direction well *1080 but the directions had to be given slowly and sometimes repeated. She could not read written directions. It was noted that she related to adults very well. All the children liked her. "She is a good little girl  tries to please others." (Tr. 138). Plaintiff missed 21 days of school during the second grade year. Apparently, she had trouble with chest colds and ear infections. (Tr. 139).
Pursuant to the request of the Office of Disability Determinations, Plaintiff was administered the Wechsler Intelligence Scale for Children-Revised (WISC-III), on May 19, 1997. Plaintiff was cooperative and related easily with her examiner. (Tr. 218). Her verbal I.Q. was 78, her Performance I.Q. was 73 and her Full Scale I.Q. was 73. It was the opinion of the examiner that this was a valid profile and measure of the present functioning level of this individual. Plaintiff showed a limited understanding and memory. Her concentration and persistence were adequate for her I.Q. level. (Tr. 219). Based on the results of the evaluation, the examiner diagnosed Plaintiff with Borderline Intellectual Functioning with the environmental stressor of educational problems. (Tr. 220).
On June 2, 1997, Cheryl Ketelson, a counselor with Disability Determination Services, had contact with Plaintiff's mother. The contact was made with Ms. Oberts in order to obtain information regarding Plaintiff's daily functioning. The following was noted:
Theresa plays with a neighbor girl who is 7-yrs. old. They play well together. She rides her 2-wheeled bike around her yard but her mother does not let her ride down the street. She enjoys watching cartoons on TV. She can watch for up to 1 hr. at a time, especially TV movies. She can run the remote control for the TV and can load a movie in the VCR and play it. Theresa cannot tell time on any type of clock. Her mother needs to remind her to tend to personal hygiene. She will not bath or brush her hair without being told. She will change into clean clothes without being told but sometimes gets her underwear on wrong. Her mother picks out her clothes for her because Theresa won't do it right. Theresa can make a bologna sandwich for a snack, but her mom won't let her use the stove or microwave for safety reasons. Theresa likes to be in the kitchen and helps by getting ingredients out and equipment. Theresa does not make her bed and is not allowed to help with other household chores because mom says she won't do them right. She does help clear the table after a meal and will help rinse the dishes. She is eager to help, but mom is very conservative on what she will allow Theresa to do. Theresa does take the 2 dogs outside to go to the bathroom. She is good about this. She goes to bed around 9:00 without any problems and sleeps soundly throughout the night. Theresa goes to Sunday School but cannot remember the stories when she gets home. Mom says her memory is her biggest problem.
(Tr. 134).
In January 1998, Plaintiff was referred for a three-year re-revaluation by Tim Ward, Franklin School Counselor, to determine whether a continuing need existed for special education services for Plaintiff. (Tr. 193). Health concerns on the three-year re-evaluation indicated that Plaintiff had a history of febrile seizures but, as of October 1997, was not taking any medication for them. She was taking imipramine for bedwetting. Her gross and fine motor skills were adequate. Her vision was fine, as was her hearing. Intellectual and cognitive screening indicated general cognitive delays. (Tr. 193-195).
*1081 The three-year re-evaluation also revealed that adaptive behavior delays were thought to persist. Primary deficits within the "communication skills" domain were concerned with reading and writing weaknesses. Primary deficits within the "daily living skills" domain were concerned with performing routine household tasks, cooking and preparing foods, and managing money. Major concerns in the "socialization" domain involved responding appropriately to strangers and following community rules. (Tr. 196).
It was noted on the three-year re-evaluation that Plaintiff was working at the preprimer-primer level in word recognition and reading comprehension. Her listening comprehension appeared to be better than her reading comprehension. She could count and read numbers to 100, and could count to 100 by tens. She could add and subtract simple problems. She could tell time by the hour only. During journal writing, Plaintiff could usually identify the beginnings and other consonant sounds in words but had trouble with vowel sounds. She could form all her uppercase and lowercase letters from memory. Her manuscript handwriting was satisfactory. With help she could construct and write a simple sentence, but failed to use correct capitalization and punctuation. It was noted that she was a hard worker, that she usually completed assignments and that she followed classroom and school rules. She worked well independently and within a small group. She got along well with her peers and adults in school. (Tr. 200).
Screening on the evaluation indicated that Plaintiff's articulation, voice and fluency were appropriate for Plaintiff's age and sex. No serious behavioral problems were reported; hence no formal assessment was deemed necessary in this area. Classroom observations seemed suggestive of substantial academic delays for Plaintiff's current grade classification. (Tr. 201).
Having reviewed the test data, observations and reports, the evaluation team concluded that Plaintiff continued to meet state and local eligibility criteria as a student with Mild Mental Retardation. Plaintiff's academic performance continued to be consistent with that of a child with mild mental retardation, suggesting substantial academic delays. Plaintiff continued to present a need for special education services and it was believed by the evaluators that discontinuation of them would likely result in substantial regression. (Tr. 193-195).

IV.

LEGAL STANDARDS
Legislation was signed into law on August 22, 1996, which altered the statutory standard for children seeking SSI benefits on disability. See Personal Responsibility and Work Opportunity Reconciliation Act of 1996, hereinafter the Welfare Reform Act, Pub.L. No. 104-193, 110 Stat. 2105 (1996). The new definitions of childhood SSI disability provide that:
An individual under the age of eighteen (18) shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which have lasted, or can be expected to last for a continuous period of not less than 12 months.
Welfare Reform Act at § 211(a)(4) (codified at 42 U.S.C. § 1382c(a)(3)(C)(I)).
The new legislation sets forth a three-step process for determining whether a child is eligible for SSI benefits on the basis of disability. First, the ALJ must determine whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If not, step two requires the *1082 ALJ to determine whether the child's impairment or combination of impairments is severe. If a child's impairment is so "slight" that it causes no more than minimal functional limitations, it will be determined that the child does not have a "severe" impairment and is not disabled. 20 C.F.R. § 416.924(c). If, however, it is determined that the child's impairment is severe, the analysis moves to the third step of the evaluation process.
At step three of the evaluation process, the ALJ must determine whether a child's impairment meets, medically equals, or functionally equals the severity of a listed impairment set forth in Appendix 1 of 20 C.F.R. Part 404, Subpart P. 20 C.F.R. § 416.924(d). If a child's impairment does not meet or equal a listed impairment, the ALJ will assess all functional limitations caused by the child's impairment to determine whether the functional limitations are disabling. 20 C.F.R. § 416.926(a). If the child does not have an impairment which medically meets or equals a listed impairment, or is functionally equal in severity to a listed impairment, he or she will be found not disabled. 20 C.F.R. § 416.924(d).
Functional equivalence is measured in several ways. If the child's condition results in extreme limitations in one or more specific functions which are described as criteria for disability in the listed impairments, she will be found disabled. 20 C.F.R. § 416.926a(b)(1). Also, if a child's condition results in "extreme" limitation of functioning in one broad area of functioning, or "marked" limitation of functioning in two broad areas of functioning, she will be found disabled. 20 C.F.R. § 416.926a(b)(2).

V.

DETERMINATION OF THE ALJ
After considering the evidence of record, Judge Cosentino considered the first step of the three-step analysis. He found that Plaintiff, as a nine-year-old, had never performed substantial gainful activity. (Tr. 17).
Judge Cosentino then continued to the second step of the three-step analysis. He assessed the records and determined that the evidence established that Plaintiff had borderline intellectual functioning, which was "severe" within the meaning of 20 C.F.R. § 416.924(c). (Tr. 17).
The ALJ's analysis then continued to the third step of the analysis. At that point, the ALJ was required to determine whether a child's impairment meets, medically equals, or functionally equals the severity of a listed impairment set forth in Appendix 1 of 20 C.F.R. Part 404, Subpart P. 20 C.F.R. § 416.924(d). In the present case, the ALJ determined that Plaintiff's impairment was not of a severity that met or medically equaled the severity of any listed impairment. (Tr. 17). Thus, the ALJ continued his analysis to evaluate Plaintiff's functional equivalence under the broad areas of functioning standard. (Tr. 15).
The ALJ found Plaintiff's functional limitations not disabling as Plaintiff did not show an "extreme" limitation in at least one area of functioning, or a "marked" limitation in at least two areas of functioning. (Tr. 17). Specifically, the ALJ found that in the area of cognitive/communication function, Plaintiff had "marked" limitation. (Tr. 15). The ALJ noted that this level of functioning was indicated by Plaintiff's test findings, and her enrollment in special education classes. (Tr. 15). In addition, the record supported that Plaintiff had limited learning abilities, lacking the ability to read and understand simple sentences, spell three to four letter words, or add and subtract numbers over ten. (Tr. 15).
In terms of Plaintiff's functioning in the area of motor skills, the ALJ found that *1083 Plaintiff had no limitations. (Tr. 16). The ALJ noted that Plaintiff was able to ride a bicycle at home. (Tr. 16). She was also able to use a remote television control. (Tr. 16).
In the broad area of social functioning, the ALJ found that Plaintiff had no limitation. (Tr. 16). The ALJ noted that Plaintiff's mother had not reported any deficits in Plaintiff's social functioning. (Tr. 16).
In the area of personal skills, the ALJ found that while Plaintiff had some limitation, it was less than "marked." (Tr. 15). The ALJ noted that although Plaintiff needed to be reminded to do so, she was able to cooperate with others in taking care of her personal needs. (Tr. 15-16). After being reminded by her mother, Plaintiff was able to bathe and brush her hair, and, although she occasionally did so incorrectly, she dressed herself as well. (Tr. 16). The ALJ also noted that Plaintiff was able to prepare herself a snack and assist in some household chores, including clearing the table after meals, doing dishes and walking the family pets. (Tr. 16).
Finally, in the area of concentration, persistence and pace, the ALJ found that Plaintiff had no limitation. (Tr. 16). The ALJ noted that Plaintiff's mother reported that Plaintiff was able to sustain the concentration required to watch approximately one hour of televised programming. (Tr. 16). Moreover, Plaintiff's teacher indicated that Plaintiff was able to complete all tasks when provided one-on-one instructions. (Tr. 16).
The ALJ concluded that Plaintiff's impairment was not functionally equivalent to any listed impairment. Thus, the ALJ found that Plaintiff was not disabled as that term is defined in the Social Security Act, at any time through the date of the decision. (Tr. 18). As a result, Plaintiff was not eligible for Supplemental Security Income under Sections 1602 and 1614(a)(3)(A) of the Social Security Act, at least through the date of the ALJ's decision. (Tr. 18).

VI.

EVIDENCE BEFORE THE APPEALS COUNCIL
As stated above in the "Procedural History" section, subsequent to the issuance of the ALJ's decision, Plaintiff appealed the decision to the Appeals Council. With her appeal, Plaintiff submitted additional medical evidence and briefing. The Appeals Council reviewed the additional evidence and declined to re-hear Plaintiff's case.
The Eighth Circuit Court of Appeals has directed that the federal courts within this Circuit shall consider the Appeals Council evidence even when the Appeals Council denies the review. Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir.1992). In Nelson, the court stated that "[t]he newly submitted evidence is to become part of what we will loosely describe here as the `administrative record,' even though the evidence was not originally included in the ALJ's record." Nelson, 966 F.2d at 366. If the Appeals Council considers that new evidence but declines to review the case, the court is to "review the ALJ's decision and determine whether there is substantial evidence in the administrative record which now includes the new evidence, to support the ALJ's decision." Nelson, 966 F.2d at 366. Therefore, this Court, in reviewing the ALJ's decision, must consider the following records which were not before the ALJ at the time he rendered his decision.
On July 8, 1998, Robert Gardner, M.D., a neurologist with Neurologic Associates of Cape Girardeau, Inc., issued a consultation report regarding Plaintiff. She was being evaluated for possible seizures. Plaintiff's mother reported that Plaintiff jerks a lot *1084 while sleeping. Plaintiff sleeps with her mother and her mother stated she can feel the bed jerking a short time but when she turns over, any shaking has stopped. The mother has not actually seen any jerking and Plaintiff does not remember any jerking. There is no jerking during the day time. There has been no witnessed seizure activity. The mother described Plaintiff as clumsy and said she runs into walls and falls a lot. (Tr. 239).
After a normal examination, the doctor's impressions were possible seizure disorder associated with developmental retardation. (Tr. 240). Plaintiff underwent a CT scan pursuant to Dr. Gardner's direction. The scan was normal. (Tr. 241). An Electroencephalogram was also normal. (Tr. 242).
Dr. Gardner prescribed Dilantin. Plaintiff's jerking spells decreased although it was noted in August that she still had some jerking spells. Plaintiff's level of Dilantin was increased on August 19, 1998. (Tr. 236). By August 24, 1998, Plaintiff reported to Dr. Gardner that she was no longer jerking. She was, however, still sensitive to light and headaches. (Tr. 232-233).
On October 14, 1998, Plaintiff returned to Dr. Gardner complaining of a seizure the previous day. Her prescription of Dilantin was continued. (Tr. 232).
Pursuant to Plaintiff's mother's request, Plaintiff underwent another re-evaluation on November 19, 1998. (Tr. 244). After screening, general impressions suggested cognitive delays. (Tr. 245). Plaintiff was given the Stanford-Binet intelligence Scale (4th Ed). Considering her chronological age, Plaintiff obtained a test composite score of 55 ± 5. Based on this score, Plaintiff placed in the Mentally Retarded classification of general intellectual functioning and at the .25th percentile. This is indicative that she exceeds less than .25% of the children in the standardization group. The chances are that about 95 out of 100, upon retesting, Plaintiff's IQ would fall within the interval of 50 to 60. (Tr. 246).
Compared to the general population, no significant strengths were indicated. All subjects measured significant weaknesses. Her attention and task focus during testing appeared to be satisfactory. Good rapport was established with the examiner. (Tr. 247).
The Vineland Adaptive Behavior Scale was given to Plaintiff. Her composite score was 74 which is classified as "moderately low." Primary deficits within the communication skills domain were concerned with reading and writing weaknesses. (Tr. 247). Primary deficits in the daily living skills domain were concerned with performing routine household tasks, cooking and preparing foods, and managing money. Major concerns in the socialization domain involved such things as responding appropriately to strangers and following community rules. (Tr. 248).
Brigance Testing revealed that her reading was below first grade levels. She had not mastered first grade spelling. She had not mastered constructing and writing sentences at the first grade level. (Tr. 250). Her math skills were approximately at the first grade level. Her money skills were at the first grade level. (Tr. 251). Classroom observation seemed suggestive of substantial academic delays for Plaintiff's current grade classification. (Tr. 253).
Having reviewed the test data, observations and reports, the multi-disciplinary team concluded that Plaintiff continued to meet state and local eligibility criteria as a student with Mild Mental Retardation. Her academic performance continued to be more consistent with that of a mildly mentally retarded child and she continued to present a need for special education services. *1085 Discontinuation of services would likely result in substantial regression. (Tr. 254).

VII.

DISCUSSION
The issue before the Court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992). Substantial evidence is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.1992). Thus, even if there is substantial evidence which would support a decision opposite to that of the Commissioner, the Court must affirm his decision as long as there is substantial evidence in favor of his position. Jones, 86 F.3d at 826.
Plaintiff states that substantial evidence does not support the ALJ's determination. Defendant disagrees. Upon reviewing the administrative record as a whole, the undersigned finds that the decision of the ALJ in the instant cause of action is supported by substantial evidence in many respects but must be remanded to the Commissioner for further proceedings concerning Plaintiff's I.Q. assessment.
Plaintiff argues that she meets the requirements for a myriad of listings at 20 C.F.R. Part 404, Subpart P, Appendix 1. The Court finds that substantial evidence on the record as a whole supports the ALJ's determination that Plaintiff is not disabled under any of these listings except for possibly § 112.05C, which requires further consideration upon remand.

A. Mental Retardation under § 112.05
Section 112.05 of the listings provides:

Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
Plaintiff contends that she meets the requirements in Paragraphs A, C, D, E and F, and that substantial evidence does not exist to support the ALJ's decision to the contrary.

1. Paragraph C

Paragraph C of § 112.05 provides that a claimant meets the requirements of being disabled under § 112.05 is she has "[a] valid verbal, performance, or full scale IQ of 59 or less." Plaintiff contends that the I.Q. assessment performed by the school in November 1998, after the ALJ issued his decision, which she submitted to the Appeals Council, establishes that she meets this criteria. Furthermore, Plaintiff argues that the ALJ erred in relying upon Dr. Drickey's I.Q. assessment as Dr. Drickey used an outdated test when assessing Plaintiff's I.Q.
The regulations provide that I.Q. test results obtained before the age of 7 are current for two years if the tested I.Q. is less than 40, and for 1 year if the tested I.Q. is at 40 or above. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D. In his decision denying benefits, the ALJ noted that the results of two I.Q. assessments were referenced in the record. (Tr. 13). The Wechsler Preschool and Primary Scale of Intelligence - Revised (WPPSI-R), administered on December 21, 1994, indicated a verbal I.Q. of 51, a performance I.Q. of 57, and a full-scale I.Q. of 50. (Tr. 13). The Stanford-Binet (4th Ed.) indicated a composite score of 65 on January 9, 1995. (Tr. *1086 13). Both of these test scores, however, were obtained before Plaintiff was seven years old. Moreover, both the tests had been administered more than one year prior to the ALJ's decision dated September 25, 1998. (Tr. 18). See also, Plaintiff's Brief, p. 2. Thus, neither of these I.Q. scores were current and could not be considered by the ALJ in his determination.
As a result of the fact that a current I.Q. score for Plaintiff did not exist, Plaintiff was referred to Dr. Drickey by the Office of Disability Determinations. Dr. Dickey administered the WISC-III on May 19, 1997, shortly after Plaintiff applied for her SSI benefits. At that time, Plaintiff was older than seven years of age. Plaintiff obtained a verbal I.Q. score of 78, a performance I.Q. score of 73, and a full scale I.Q. score of 73. (Tr. 218-223). The ALJ found these scores indicated that Plaintiff had borderline intellectual functioning. (Tr. 14). As this was the only current I.Q. assessment in the record at the time of the ALJ's determination, the ALJ properly relied upon these scores as substantial evidence to support his conclusion that Plaintiff did not suffer a disability as that term is defined in the Act.
Plaintiff argues that the test performed by Dr. Drickey should be disregarded due to purported testimony at trial that the WISC-III is not a valid I.Q. test because it improperly inflates I.Q. scores. Plaintiff states that testimony at the hearing established that the test administered by Dr. Drickey, the WISC-III, is no longer a valid and reliable means of measuring I.Q. Plaintiff further states that this test has been updated, revised, and is no longer used in the current practice of psycho-educational testing. Plaintiff states that "one of the reasons for not using this I.Q. exam is that the scores reported by it are much higher than other I.Q. test results would indicate." See Plaintiff's Brief, p. 3.
The Court agrees with Defendant that Plaintiff has confused the WISC-III with a different test that was discussed at the hearing. Liberally adopting Defendant's argument contained in his brief, the Court notes that, at the hearing, the psychological examiner at Plaintiff's school, Ms. Bennett, was asked to comment on the I.Q. results of the test administered by Dr. Drickey. (Tr. 37-43). She noted that Dr. Drickey had apparently written the wrong name of the test he administered. (Tr. 41). Ms. Bennett was correct. Dr. Drickey had mistakenly written that he had administered the WAIS-R (given to adults) to Plaintiff. (Tr. 219). Eleven days after his examination, Dr. Drickey corrected his report to reflect that he had actually administered the WISC-III. (Tr. 222). This may have created some of Plaintiff's confusion.
Regarding the WISC-III, however, Plaintiff's assertion that the test is outdated is incorrect. Ms. Bennett testified that the WISC-R was outdated and yielded inflated scores, not the WISC-III. She testified: "The WISC-R is outdated and we don't use it, and most schools don't. Most people testing don't use the WISC-R anymore." (Tr. 43). Ms. Bennett also explained the reason: "Because there's very much difference in the way the scores come out on the WISC-R, and the WISC-III. The WISC-R scores tended to be inflated in comparison to the third edition, the WISC-III scores." (Tr. 41). Ms. Bennett discredited the WISC-R, not the test administered by Dr. Drickey, the WISC-III. Thus, Plaintiff's contention that the test administered by Dr. Drickey was invalid and unreliable is unfounded. The ALJ properly relied on Dr. Drickey's report to conclude that Plaintiff had a full scale I.Q. of 73. (Tr. 14).
Were Dr. Drickey's report the only report in the record concerning Plaintiff's *1087 I.Q., the Court would have no difficulty concluding that the Commissioner's decision was supported by substantial evidence on the record in all respects. However, after the ALJ issued his decision in September 1998, Plaintiff asked for a re-evaluation of Plaintiff's I.Q. by the school district. Her request was granted and, in November 1998, Plaintiff was administered, through the school, the Stanford-Binet (4th Ed.). Plaintiff registered an I.Q. score of 55 on that test. (Tr. 246). The Appeals Council considered this evidence but, without discussion, nonetheless found that the ALJ's decision was supported by the record as a whole. (Tr. 3-5).
Clearly, there is conflicting evidence regarding Plaintiff's I.Q. Although the Appeals Council found that the ALJ's decision was supported by the record as a whole, there is no discussion as to why the test scores from the school system were disregarded or why the test scores of Dr. Drickey, a consultative examiner, were given more credence over the scores obtained through the school's testing. In light of the vast, and critical, disparity between these two I.Q. assessments, the Court finds that this case should be remanded to the Commissioner for further findings. Either additional testing is necessary or the Commissioner must provide some explanation as to why Dr. Drickey's results should be given more credence. The resolution of this issue is important because, under Paragraph C of § 112.05, if Plaintiff has an I.Q. of 59 or below, she is disabled and is entitled to benefits.

2. Paragraph A

Plaintiff argues that substantial evidence was submitted at the appeals hearing under which the Commissioner should have found that Plaintiff qualifies as a disabled child under Paragraph A of § 112.05. Paragraph A of § 112.05 provides that a claimant will meet the listings for "mental retardation" if at least two of the appropriate age-group criteria in paragraph B2 of § 112.02 are met.
Section 112.02 is titled "Organic Mental Disorders." Paragraph B2 of that section for children ages 3 to 18 provides the following:
a. Marked impairment in age-appropriate cognitive/communicative function ...; or
b. Marked impairment in age-appropriate social functioning ...; or
c. Marked impairment in age-appropriate personal functioning ....; or
d. Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.
Pt. 404, Subpt. P, App. 1, § 112.02B2. Where "marked" is used as a standard for measuring the degree of limitation,
it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function ... independently, appropriately, effectively, and on a sustained basis.
Pt. 404, Subpt. P, App. 1, § 112.00C.
The ALJ found that Plaintiff had "marked" limitation in her cognitive/communicative function. This meets one of the two criteria set forth in Paragraph B of § 112.02. However, the ALJ did not find that Plaintiff had a "marked" limitation in any of the other areas set forth in Paragraph B of § 112.02.
The ALJ found that Plaintiff had no limitation in her social functioning. Substantial evidence on the record as a whole supports this conclusion by the ALJ. *1088 Plaintiff's mother reported no limitations as to Plaintiff's social skills and, in fact, indicated that Plaintiff plays well together with a seven-year-old neighbor girl. Additionally, Plaintiffs teacher, Nora Stranahan, reported no observed limitations, indicating that Plaintiff was well liked by all the children. Further, Ms. Stranahan reported that Plaintiff related well with adults (i.e., teachers, counselors, and other adults). When Plaintiff underwent her three-year evaluation in January 1998, it was noted that Plaintiff worked well independently and within a small group. It was also noted that Plaintiff "gets along well with her peers and adults in school." (Tr. 200). When Plaintiff was tested by Dr. Drickey, he noted that Plaintiff was cooperative and related easily with her examiner. When Plaintiff was tested by the school in November 1998, it was again noted that Plaintiff established good rapport with the examiner. (Tr. 247). Clearly, all of the above constitutes substantial evidence on the record as a whole to support the ALJ's conclusion that Plaintiff does not suffer from a marked limitation in social functioning.
The ALJ found that Plaintiff had no limitation in concentration, persistence or pace. Again, substantial evidence on the record as a whole supports this conclusion by the ALJ. Plaintiff's mother reported that Plaintiff was able to sustain the concentration required to watch approximately one hour of televised programming. Although Plaintiff's mother reported that Plaintiff was limited in her ability to finish things that she starts, Ms. Stranahan contradicted this, indicating that Plaintiff was able to complete all tasks when provided one-on-one instruction. In addition, it was noted at her evaluation in November 1998, that Plaintiff's attention and task focus during testing appeared to be satisfactory. Certainly, evidence exists in the record to the contrary. And, indeed, this might be one of those instances where one could reach the opposite conclusion on this issue and substantial evidence on the record as a whole would support that opposite conclusion. However, this does not preclude a finding that substantial evidence on the record as a whole supports the ALJ's finding that Plaintiff does not suffer from deficiencies in concentration, persistence or pace.
The ALJ found that Plaintiff had some limitation in her personal skills, but that this limitation was less than marked in severity. Substantial evidence on the record as a whole supports this conclusion by the ALJ. Plaintiff's mother reported that Plaintiff, though able to cooperate with others in taking care of her personal needs, would not tend to her personal hygiene of her own accord. Particularly, Plaintiff would not bathe or brush her hair without being reminded. Furthermore, Plaintiff's mother reported that Plaintiff, although independently able to dress herself and able to change into clean clothes without being asked, would occasionally put some articles of clothing on backwards. However, there is nothing about any of these assertions that appears unusual for most nine-year-old children. Moreover, despite these assertions, Plaintiff's mother did report that Plaintiff was able to fix herself a snack and assist in some household chores, including clearing the table after meals, doing dishes, and walking the family pets. In addition, she helped with meal preparation by getting ingredients and equipment out for her mother.
In sum, substantial evidence on the record as a whole supports the ALJ's determination that Plaintiff does not meet the required two criteria of paragraph B in § 112.02. As such, she did not meet the requirements of paragraph A of § 112.05 and could not be found to be disabled under that listing.

*1089 3. Paragraph D

Plaintiff also contends that she is disabled under the listing found at Paragraph D of § 112.05. That paragraph provides that a claimant will be found to be disabled as a result of mental retardation if: first, a valid verbal, performance, or full scale IQ of 60 through 70 is evident; and, second, a physical or other mental impairment imposing additional and significant limitation of functioning is present.
Assuming for the sake of argument that Plaintiff's I.Q. was 55, as found by the most recent Stanford-Binet (4th Ed.) administered by the school in November 1998, Plaintiff's clam of disability under this section nonetheless fails. The Court finds that substantial evidence on the record as a whole supports the ALJ's conclusion that Plaintiff does not have a physical or other mental impairment imposing additional and significant limitation of function.
Plaintiff contends that evidence was presented at the hearing of an additional physical impairment imposing limitations of functioning on Plaintiff in that she has a neurological disorder and suffers from convulsions and seizures at night, along with bedwetting, and frequently falls and loses her balance. The symptoms of this neurological disorder were presented at the appeals hearing and this, according to Plaintiff, together with her I.Q. score, qualify her as disabled under § 112.05D.
Although Plaintiff maintains that she has a neurological disorder, medical records do not support such a conclusion. In July 1998, Dr. Gardner evaluated Plaintiff for possible seizures based on Plaintiff's mother's report that Plaintiff jerks a lot while sleeping. However, Plaintiff's mother has never actually seen this. No one has witnessed any seizure activity. Moreover, there is no jerking during the day time. Although the mother reported to the doctor that Plaintiff was clumsy and bumped into walls and fell a lot, none of Plaintiff's educators reported observing this. Physical examination by Dr. Gardner was normal. A CT scan was normal. An electroencephalogram was normal. The doctor diagnosed only "possible" seizure disorder. There is nothing in this evidence to support that Plaintiff has a neurological disorder.
The Court notes that the resolution of the disparity between Plaintiff's two I.Q. assessments presently in the record would have no impact on the issue of whether Plaintiff meets the requirements set forth in Paragraph D. While, upon further consideration by the Commissioner, she might meet the I.Q. requirement, she does not meet the requirement of having a physical or other mental impairment imposing additional and significant limitation of function. Therefore, the Court finds that substantial evidence on the record as a whole supports the ALJ's determination that Plaintiff is not disabled under § 112.05D.

4. Paragraph E

Plaintiff contends that she meets the requirements for disability set forth in Paragraph E of § 112.05. That paragraph provides that a claimant will be disabled under the listings for Mental Retardation if she has: first, a valid, verbal, performance, or full scale IQ of 60 through 70; and, second, meets the requirements of either paragraph B2b or B2c or B2d of § 112.02. As stated earlier, Paragraph B2b of § 112.02 requires a marked impairment in age-appropriate social functioning. Paragraph B2c requires a marked impairment in age-appropriate personal functioning. Paragraph B2d requires deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.
Even assuming Plaintiff could meet the I.Q. requirement upon further consideration by the Commissioner, for the reasons *1090 already discussed, the Court finds that substantial evidence on the record as a whole supports the ALJ's conclusion that Plaintiff does not have a marked impairment in social functioning or deficiencies of concentration, persistence or pace. While the ALJ found that Plaintiff did have some limitation in her Personal skills, this limitation was less than marked in severity.
The Court notes that the resolution of the disparity between Plaintiff's two I.Q. assessments presently in the record would have no impact on the issue of whether Plaintiff meets the requirements set forth in Paragraph E. While, upon further consideration by the Commissioner, she might meet the I.Q. requirement, she does not meet the other necessary requirements. Thus, the Court finds that substantial evidence upon the record as a whole supports the ALJ's determination that Plaintiff is not disabled under § 1 12.05E.

5. Paragraph F

Finally, Plaintiff contends that she is disabled due to mental retardation because she meets the requirements set forth in Paragraph F of § 112.05. Under that paragraph, a claimant will be found to meet the listings for mental retardation if: first, the claimant meets the requirements of Paragraph B2a of § 112.02; and, second, the claimant has a physical or other mental impairment imposing additional and significant limitations of function. Paragraph B2a of § 112.02 requires a marked impairment in cognitive/communicative function.
The ALJ found that Plaintiff did suffer from a marked impairment in cognitive/communicative function. However, the ALJ found that Plaintiff did not have a physical or other mental impairment imposing additional and significant limitations of function. For the reasons already discussed, the Court finds that substantial evidence on the record as a whole supports the ALJ's determination that Plaintiff is not disabled under § 112.05F.

B. Organic Mental Disorders under § 112.02
In addition to believing she is entitled to benefits due to mental retardation under § 112.05, Plaintiff also argues that she meets the requirements for organic mental disorders under § 112.02, both paragraphs A and B. Section 112.02 provides:

Organic Mental Disorders: Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain. The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
Pt. 404, Subpt. P, App. 1, § 112.02.
Paragraph A of § 112.02 provides that "[m]edically documented persistence of at least one of the following" must be present: (1) developmental arrest, delay or regression; (2) disorientation to time and place; (3) memory impairment, either short-term or long-term; (4) perceptual or thinking disturbance (e.g., hallucinations, delusions, illusions, or paranoid thinking); (5) disturbance in personality (e.g., apathy, hostility); (6) disturbance in mood (e.g., mania, depression); (7) emotional liability (e.g., sudden crying); (8) impairment or impulse control (e.g., disinhibited social behavior, explosive temper outburst); (9) impairment of cognitive function, as measured by clinically timely standardized *1091 psychological testing; or (10) disturbance of concentration, attention, or judgment.
In addition to having at least one of the requirements set forth in Paragraph A of § 112.02, the claimant must also meet the requirements of Paragraph B. Paragraph B has been discussed earlier in the context of the listings for mental retardation. Again, it provides that the claimant must have at least two of the following: (a) marked impairment in age-appropriate cognitive/communicative function; (b) marked impairment in age-appropriate social functioning; (c)marked impairment in age-appropriate personal functioning; or(d) deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.
Regardless of whether Plaintiff can meet any one of the requirements set forth in Paragraph A of § 112.02, this Court has already determined that substantial evidence on the record as a whole supports the ALJ's conclusion that Plaintiff does not meet the requirements of Paragraph B of § 112.02. That is, although the ALJ found that Plaintiff had a marked impairment in age-appropriate cognitive/communicative function, the ALJ did not find that Plaintiff had a marked impairment in any other areas. As at least two areas must be impaired, Plaintiff cannot meet the requirements of § 112.02. The ALJ's conclusion is supported by substantial evidence on the record as a whole.

C. Meningomyelocele under § 111.08
Plaintiff also argues that she meets the requirements for meningomyelocele under § 111.08 at Paragraph B. Meningomyelocele is the "[p]rotrusion of the spinal cord and its membranes through a defect in the vertebral column." See Stedman's Medical Diction (26th Ed.), pg. 1088. In order to meet the listed impairment of § 111.08, a claimant must not only have meningomyelocele, but additionally must have one of the following despite prescribed treatment:
A. Motor dysfunction meeting the requirements of § 101.03 or § 111.06; or
B Less severe motor dysfunction (but more than slight), and
1. Urinary or fecal incontinence when inappropriate for age; or
2. IQ of 70 or less; or
C. Four extremity involvement; or
D. Noncompensated hydrocephalus producing interference with mental or motor developmental progression.
Pt. 404, Subpt. P, App. 1, § 111.08.
Nowhere in the record is there any mention that Plaintiff suffers from meningomyelocele. Thus, she does not have an impairment that meets or medically equals the severity of this listed impairment. The Court therefore assumes that Plaintiff is arguing that her impairment is functionally equal in severity to this listed impairment; specifically, that she meets the requirements of Paragraph B of this section.
In order for Plaintiff's impairment to functionally equal in severity to Paragraph B of this listed impairment, Plaintiff must establish that she has more than a slight motor dysfunction and either urinary incontinence or an IQ of 70 or less. Substantial evidence on the record as a whole supports the Commissioner's conclusion that Plaintiff does not suffer from more than a slight motor dysfunction. Neurological examination and testing have not shown any abnormality. Moreover, Dr. Gardner found that Plaintiff had normal muscle bulk, tone, and strength in her arms and legs, her fine motor coordination was good, her reflexes were symmetric, and her gait and station were normal. (Tr. 240). A CT scan was normal and the electroencephalogram was normal. Plaintiff's *1092 mother reported that Plaintiff did not have any limitations in her physical abilities. Moreover it was noted in January 1998 and Plaintiff's three-year re-revaluation that Plaintiff's gross and fine motor skills were adequate.
There is no evidence whatsoever to support a conclusion that Plaintiff suffers from anything other than a slight motor dysfunction. Moreover, any conclusion that Plaintiff suffers from even a slight motor dysfunction is based only on Plaintiff's mother's testimony that Plaintiff occasionally bumps into walls and falls. No one else has witnessed this.
Because Plaintiff cannot establish that she suffers from more than a slight motor dysfunction, whether she has an I.Q. below 70 or whether she suffers from incontinence inappropriate for her age is irrelevant. Without the presence of more than a slight motor dysfunction, Plaintiff cannot be found to meet the functional equivalent of the disability set forth in § 111.08.

D. Communicative Impairment under § 111.09
Finally, Plaintiff contends that she qualifies as disabled under § 111.09 as there is evidence of a documented neurological disorder along with a documented comprehension deficit resulting in ineffective verbal communication for her age. Section 111.09 requires a communication impairment, associated with documented neurological disorder. In addition, it requires:
A. Documented speech deficit which significantly affects the clarity and content of the speech; or
B. Documented comprehension deficit resulting in ineffective verbal communication for age; or
C. Impairment of hearing as described under the criteria in 102.08.
Pt. 404, Subpt. P, App. 1, § 111.09.
If Plaintiff is asserting that she meets or equals the listed impairment set forth in § 111.09, her claim fails for the same reason Plaintiff's claim failed under § 111.08. In order to be disabled under this listing, Plaintiff must first establish that she has a communication impairment associated with a documented neurological disorder. Any purported neurological disorder from which Plaintiff suffers is in no way associated with any communication impairment she may have. Moreover, any communication deficit exhibited by Plaintiff is documented as a result of her borderline intellectual functioning, not a communicative impairment or neurological disorder. Thus, the Court assumes, once again, Plaintiff is arguing that her impairment is functionally equivalent to the impairment listed in § 111.09 at Paragraph B.
Plaintiff's claim that she suffers from a disability which is functionally equal to that listed in Paragraph B of § 111.09 fails. Although testing indicated that Plaintiff had a moderately low level of expressive communication (Tr. 247), the evidence indicates that Plaintiff was able to communicate adequately. Plaintiff's special education teacher specifically noted that Plaintiff had no speech disorder. (Tr. 64). Dr. Gardner found that Plaintiff's language function was intact. (Tr. 240). Plaintiff's teachers also noted in February 1998 that Plaintiff's articulation, voice and fluency were appropriate. (Tr. 201). Ms. Bertrand reported that Plaintiff's verbal skills seemed to be higher than her performance and that she was able to express her needs and wants. (Tr. 65). Plaintiff's mother reported that, although Plaintiff had difficulty relaying telephone messages, she was able to tell jokes or riddles accurately, and talk with family and friends. (Tr. 157). Therefore, the Court finds that substantial evidence on the record as a whole supports the ALJ's finding that Plaintiff is not disabled under § 111.09.

*1093 VIII.

CONCLUSION
In summary, the Court finds, regardless of Plaintiff's I.Q., substantial evidence on the record as a whole supports the Commissioner's determination that Plaintiff is not disabled under § 112.05A, § 112.05D, § 112.05E, § 112.05F, § 112-02 A and B, § 111.08 or § 111.09. Thus, the Commissioner's decision with regard to these findings must be affirmed.
However, the Court finds that the record is inconclusive as to Plaintiff's I.Q. assessment. Until that is resolved, it is impossible to determine whether Plaintiff may be disabled under § 112.05C. Therefore, this case will be remanded to the Commissioner for further review of Plaintiff's I.Q., consistent with this memorandum and order. The Court does not mean to imply that the Commissioner should return a finding of "disabled." The Court is merely concerned that the Commissioner's final determination, as it presently stands with regard to § 112.05C, is not supported by substantial evidence on the record as a whole.
Accordingly,
IT IS HEREBY ORDERED that the relief sought by Plaintiff in her Brief in Support of Complaint is DENIED except to the extent Plaintiff requests that this case be remanded for further consideration. [13]
IT IS FURTHER ORDERED that the relief sought by Defendant in his Brief in Support of Answer is DENIED. [17]
IT IS FURTHER ORDERED that the instant cause of action shall be REMANDED to the Commissioner for further proceedings consistent with this Memorandum and Order.
IT IS FINALLY ORDERED that a separate judgment of remand shall be entered this same date in the instant cause of action.

JUDGMENT OF REMAND
In accordance with the Memorandum and Order entered this same date in the above cause of action and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that this cause of action is remanded to the Commissioner of Social Security for further proceedings pursuant to Title 42 U.S.C. § 405(g), sentence four.
NOTES
[1] On January 20, 2001, President Bush appointed William A. Halter to succeed Kenneth A. Apfel as Commissioner of Social Security. Therefore, the Court has substituted William A. Halter, Commissioner of Social Security, for Kenneth S. Apfel, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.